JO ANN T. VIECELI, Plaintiff-Appellee, *v.* ILLINOIS CIVIL SERVICE COMMISSION *et al.*, Defendants-Appellants.

First District (3rd Division)    No. 76-1016

Opinion filed January 31, 1979.

William J. Scott, Attorney General, of Chicago (Bonny Stuker Barezky, Assistant State's Attorney, of counsel), for appellants.

Martin C. Ashman, of Chicago, for appellee.

Miss JUSTICE McGILLICUDDY delivered the opinion of the court:

On January 16, 1975, the Civil Service Commission entered a decision discharging Jo Ann T. Vieceli from her position as a "Nurse V" with the Department of Mental Health and Developmental Disabilities. Vieceli subsequently filed a complaint for administrative review, pursuant to the Administrative Review Act (Ill. Rev. Stat. 1975, ch. 110, par. 264 *et seq.*) in the Circuit Court of Cook County, seeking a reversal of the commission's determination. The circuit court reversed the decision of the commission. The commission now appeals the court's order.

The discharge proceedings brought by the department against Vieceli arose out of a series of events which took place at the female adolescent unit, referred to as CW 15, at the Chicago-Read Mental Health Center during the period of March 22 to March 24, 1974. On the morning of March 22, a disturbance occurred at the unit, during which the patients at the unit damaged the facilities. To regain order, six of the patients were

restrained to their beds. At the time they were restrained, the beds did not have mattresses on them and some of the girls were not provided with pillows. By 4 p.m. that afternoon, five of the girls had been released from the restraints; the sixth patient was restrained on the bed until the afternoon of Sunday, March 24, 1974.

The written charges presented to Vieceli, which were the basis for an action for discharge, were described in the following terms:

"Willful mistreatment of patients in violation of Department of Mental Health Rules 12.02 and 4.02; Department of Mental Health Rules and Regulations, and Read Chicago State Rules and Regulations, page 2, No. 5 to wit:

You had a female patient placed in restraints from approximately 8:30 A.M. Friday, March 22, 1974, until approximately 5 P.M. Sunday, March 24, 1974, CW 15 with only two valid restraint orders on file.

On March 22, 1974, under your supervision, six female patients were restrained for periods up to and in excess of six (6) hours on bare bed frames with no mattresses or pillows."

Rule 12.02 governs the use of restraints in department facilities. Under this rule, restraints are to be employed only as a means of preventing a patient from injuring himself or another patient and not as a means of punishment. They are generally to be applied only pursuant to a written prescription signed by a physician who has personally examined the patient and has concluded that such restraints are justified. A patient may be restrained without a written order if an emergency situation exists and a physician is not immediately available. However, in such case, a written prescription is to be obtained as "quickly as possible, and in no event later than a maximum of eight hours after the initial application of such emergency restraints." A patient may be restrained during all or part of one 24-hour period, but once restraints have been applied during such a period, they cannot be applied to that patient for the "two next following calendar days" without the written consent of the facility superintendent. Under the rule the superintendent is required to review all restraint orders daily. Moreover, the rule specifically provides:

" * * * It is the responsibility of the facility superintendent to insure that this rule is complied with."

Rule 4.02 defines the mistreatment of patients. Included within this definition is the following conduct:

"4. Any willful failure to respond to a patient's obvious needs or to provide the supervision and care he should have.

5. Infliction of any other mental or physical abuse."

At Vieceli's request, a hearing on the charges was held. After both

parties rested, the commission, with one commissioner dissenting, permitted the charges to be amended to read as follows:

"Negligence of duty, in that you were, on March 22, 1974 through March 24, 1974, the Unit Chief of Ward CW 15 located at Chicago-Read Mental Health Center. As Unit Chief on those dates you were supervisor of, and responsible for, the care and treatment of all patients within the ward. On Friday, March 22, 1974 a female patient was placed in restraints where she remained, almost continuously, until Sunday, March 24, 1974, with only two (2) valid restraint orders on file. As Chief of this unit, you were negligent in your duties for allowing this illegal use of restraints.

Also, on March 22, 1974, six (6) female patients were restrained on CW 15 for periods up to and in excess of six (6) hours on bare bed frames with no mattresses or pillows. You were personally present on the unit when this took place and as unit chief you were negligent in your duties for not taking an active role in supervising the restraining procedure and ultimately allowing six (6) patients under your care to be restrained in a cruel and prohibited fashion."

At the hearing, Vieceli testified that, as a "Nurse V," she was the administrator or unit director of CW 15, responsible for the supervision, training, evaluation and program development of the unit. In addition, she was the director of all the registered nurses serving in the children and adolescent services section at Read. She stated that her immediate supervisor was the administrator for children and adolescent services and that the superintendent of the entire institution was the supervisor of the administrator. Vieceli stated that she was not present at the hospital during the disturbance on March 22 but that she was informed of the problem by telephone at 8:15 a.m. At that time she instructed the staff to contact the physician on duty, the security officer and the registered nurses to administer "any" medication.

By the time Vieceli reached the hospital, at 8:45 a.m., the six patients had already been placed in restraints. She saw the restrained patients twice that day—first around 11:15 a.m. and again around 1:30 p.m. When Vieceli visited the patients she did not inspect the restraints and she did not notice whether there were mattresses and pillows on the beds. She stated that all of the patients were covered with either a sheet or a blanket.

Around noon, Vieceli talked with Dr. John Nelson, the superintendent of the institution, about keeping one patient in restraints over the weekend. Vieceli had arranged to transfer this patient to an adult ward on the following Monday and the patient had learned that the transfer was to take place. Because the patient had threatened to run

away and take an overdose of drugs if she were ever sent to an adult unit, Vieceli felt that continued restraints were necessary to prevent harm to the girl. There was also evidence that on the prior evening, the patient had attempted to commit suicide. Vieceli stated that she went directly to Dr. Nelson to discuss the situation because no other physician was available.

At that time, Dr. Nelson signed an extended restraint request form. The signature of the requesting doctor is not shown on this form. According to Vieceli's testimony the decision to keep the patient in restraints until Monday was concurred in by all staff members who attended and who participated in a staff meeting later that afternoon.

Vieceli left the hospital on March 22 at about 3:15 p.m. or 3:30 p.m. However, prior to leaving she wrote orders to the weekend staff detailing how the patient was to be treated. Vieceli wrote that Dr. Nelson had approved extended restraints for the patient and that the staff was to procure new restraint orders from the on-duty doctor every eight hours. Vieceli further specified, in these written orders, that "[u]nder no circumstances and I mean it is [the patient] to be taken out until transfer [to the adult ward] is arranged."

Vieceli did not return to the hospital until the following Monday, although she was in contact with the staff by telephone throughout the weekend. At approximately 5 p.m. on the 22nd, Thelma Bell, a technician II who worked in CW 15, called Vieceli to see if a mattress could be placed on the bed on which the patient was restrained. Vieceli told Bell to provide the patient with a mattress. Vieceli called the unit twice on Saturday and again on Sunday morning. During the last call, she discovered that the staff had not been obtaining new authorization every eight hours for the continued restraints from a physician. She instructed the staff to immediately seek a renewal order. At the hearing, only three documents relating to the patient's restraint during the March 22-24 period were introduced: the original restraint order made on the morning of the 22nd, the extended restraint request approved and signed by Dr. Nelson, and the restraint order procured on Sunday following Vieceli's telephone call.

Eleven staff members who worked at CW 15 during this period testified. Two of the witnesses stated that they helped restrain the girls following the disturbance; they testified that they received no order from Vieceli to leave mattresses off the beds. Six witnesses testified that they worked at the ward on Friday, March 22, while Vieceli was on duty. They all stated that they knew that the beds did not have mattresses but did not tell Vieceli. Two witnesses testified that they were on duty over the weekend. One witness claimed that she read Vieceli's written instructions but believed that Dr. Nelson's approval of extended restraints negated the

requirement to have a physician examine the patient every eight hours. Another witness claimed that she did not read the written orders until Sunday.

On December 12, 1974, the hearing officer entered her findings and recommended that Vieceli be retained in her position. The commission adopted the factual findings of the hearing officer but found that Vieceli was guilty of the charges and entered an order discharging her from her position with the department. Vieceli then filed suit under the Administrative Review Act (Ill. Rev. Stat. 1975, ch. 110, par. 264 *et seq.*) challenging the commission's decision. The circuit court reversed the decision of the commission finding that it was arbitrary and capricious and contrary to the manifest weight of the evidence. The commission appeals the court's order contending that its decision was neither arbitrary and capricious nor contrary to the manifest weight of the evidence. Vieceli contends, first, that the trial court's assessment of the evidence was correct. She further argues that she was denied due process of law in that the commission permitted the charges to be amended after both parties rested their cases and that she was denied equal protection of the law because no discharge action was initiated against any of her superiors or her subordinates.

■■■ While a reviewing court is to grant a great deal of deference to a decision by an administrative agency, a decision should be sustained only if it is supported by the manifest weight of the evidence. (*Bailey v. Retirement Board* (1977), 51 Ill. App. 3d 433, 366 N.E.2d 966; *Suttle v. Police Board of Chicago* (1973), 11 Ill. App. 3d 576, 297 N.E.2d 174.) To reverse a decision of an administrative agency, the contrary conclusion must not merely be reasonable, but must be clearly evident. (*Petraitis v. Board of Fire & Police Commissioners* (1975), 31 Ill. App. 3d 864, 335 N.E.2d 126.) As initially charged, Vieceli was accused of willful violations of Rules 12.02 · and 4.02 of the department; by amendment, the department added the accusation that she had negligently violated these rules. We believe that the manifest weight of the evidence did not support any of the charges.

The department specified, at the beginning of the hearing, that by alleging willful violations of Rule 12.02, they were contending that Vieceli ordered the patient to be restrained for an extended period of time, knowing that such restraints had not been properly authorized. There is no evidence to suggest that she knew that the continued restraints were not properly authorized.

Only three documents purporting to be written prescriptions for restraints upon the patient were introduced into evidence. The commission concedes that the document authorizing the restraint on the morning of March 22 was a valid prescription. However, it argues that the

restraint renewal form signed by Dr. Nelson cannot be considered as valid because it was never signed by an examining physician. The import of this argument is that Vieceli knew this written document was not a valid restraint prescription but that she, nevertheless, instructed the staff to continue the restraints upon the patient based upon the document's authority.

From the evidence, we do not see that Vieceli willfully violated Rule 12.02. The rule provides that once restraints are used upon an individual in one 24-hour period, they may not be used again on that person without the written permission of the facility superintendent. Therefore, Dr. Nelson's written consent for continued restraints was necessary. While the rule also requires the written permission of an examining physician, this requirement is waived in an emergency situation when a physician is unavailable. Such a situation existed here. During the evening of March 21, the patient had attempted to commit suicide. The next morning she took part in a riot in the ward. In addition, the patient had been informed that she was to be transferred to an adult ward and Vieceli feared that she would carry out her threat to run away from the hospital and take an overdose of drugs. When Vieceli was unable to find a doctor to examine the patient she went directly to Dr. Nelson, who as facility super-intendent, had responsibility, under Rule 12.02, for making certain that restraint procedures were followed. At that time he signed the renewal request. Upon leaving the hospital Vieceli directed the weekend staff to obtain a physician's consent as it was needed. Under these circumstances, we do not feel that Rule 12.02 compelled Vieceli to do anything more.

The commission also asserts that a willful violation of the rule is established by the fact that, between Friday evening and Sunday morning, only one written prescription from an examining physician was obtained. This argument must also be rejected, for there is no evidence that the failure to obtain such authorization was done at Vieceli's orders or even with her knowledge. Given the nature of the instruction she tendered to the weekend staff plus the fact that she did not learn of the omission until Sunday morning, we find insufficient evidence to support the commission's case.

In addition, no willful violation of Rule 12.02 is established by the fact that, in the written instructions for the staff, Vieceli included the following statement:

"Under no circumstances and I mean it is [the patient] to be taken out until transfer [to the adult ward] is arranged."

Vieceli testified that she included this instruction to prevent several staff members, who were personally opposed to the use of restraints, from ignoring her instructions to seek renewal of the restraints. Moreover, the

inclusion of this statement in no way detracts from the import of the remaining instructions that authorization was to be sought from a physician as required by the rule.

There is also no evidence of a willful violation of Rule 4.02. By a willful violation of this rule, the department contended that Vieceli had actual knowledge that the girls were without mattresses and, again, there is no proof that she had such knowledge. Vieceli testified that when she talked with the girls who had been restrained, she never noticed whether there were mattresses on the beds and she was never informed of this omission until Bell called her at her home relative to the one patient who was still under restraint. Although members of the staff knew that the beds did not have mattresses, none of them told Vieceli.

Furthermore, we do not believe that the department established that Vieceli was negligent in allowing the patient to be restrained for an extended period of time without proper authorization. From our prior examination of Vieceli's conduct with respect to the extended restraints placed upon the patient, we see nothing to suggest that she was negligent. She was not at the hospital at the time the girls were first restrained and thus did not personally direct the application of these restraints. Likewise, we find nothing in the record to suggest that the absence of mattresses was the result of Vieceli's negligent conduct. When she observed the girls, she did not notice the absence of mattresses. The employees who knew that there were no mattresses on the beds did not advise Vieceli. We believe that there is insufficient evidence to support a claim that Vieceli was negligent in this regard. Absent proof of any negligent act or omission by Vieceli, we feel that the negligence charges must also fail.

Since we have determined that the evidence failed to substantiate any of the charges brought against Vieceli, we need not consider the due process and equal protection issues which she raised. Accordingly, we affirm the order of the Circuit Court of Cook County.

Affirmed.

McNAMARA and JIGANTI, JJ., concur.